**United States District Court**
For the Northern District of California

1

2

3

4

5

6

7

8    IN THE UNITED STATES DISTRICT COURT

9    FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11  OCCUPY FRESNO, et al.,                    No. C 11-01894 CRB

12          Plaintiffs,                       **MEMORANDUM AND ORDER**
                                              **GRANTING IN PART MOTION FOR**
13    v.                                      **PRELIMINARY INJUNCTION**

14  COUNTY OF FRESNO, et al.,

15          Defendants.
    _____/

16

17          Plaintiffs Occupy Fresno, et al., have filed a Motion for Preliminary Injunction against

18  Defendants County of Fresno, et al.  Based on the pleadings of record, the evidence

19  submitted, and the arguments of counsel, the Court holds that Plaintiffs have established a

20  likelihood of success on the merits on two of their claims.  Accordingly, the Court GRANTS

21  the Motion, in part.

22  **I.      FACTS AND PROCEDURAL BACKGROUND**

23          On November 13, 2011, Plaintiffs Occupy Fresno, an unincorporated association,

24  Vanessa Aranda, Dallas John Blanchard, Jr., Noah Canton, William Delara, Carlos Diaz,

25  Michael Dominquez, Matthew Stephen Duris, Chad Austin Hopper, Joseph Hunter and

26  Ruben Verdugo (collectively, "Plaintiffs") filed their Complaint for declaratory relief,

27  injunctive relief and damages pursuant to 42 U.S.C. § 1983 against defendants County of

28  Fresno, Fresno County Board of Supervisors, Margaret Mims in her official capacity as

United States District Court
For the Northern District of California

Fresno County Sheriff, John Navarette in his official capacity as Fresno County Administrative Officer, Jorge Granados in his official capacity as Assistant Director of Public Works and Planning, John Thompson in his official capacity as Resources Manager of Public Works and Planning, and Does 1 through 50 (collectively, "Defendants"), alleging that a number of Fresno County ordinances, on their face and as applied, unconstitutionally bar or unreasonably interfere with Plaintiffs' ability to assemble and exercise free speech at Courthouse Park in downtown Fresno.  See dkt. 1.  On the same day, Plaintiffs filed an *ex parte* Motion for a Temporary Restraining Order and Preliminary Injunction prohibiting Defendants from further enforcing the ordinances, arresting persons engaged in protected speech, assembly or expressive conduct at Courthouse Park and directing such persons to desist or disperse.  See dkt. 13.

In an Order issued November 15, 2011, the Court denied Plaintiffs' Motion for a Temporary Restraining Order without prejudice, finding that Plaintiffs had failed to provide a valid reason for proceeding *ex parte* as required under Federal Rule of Civil Procedure 65(b).  See dkt. 26.  The Court set a briefing schedule to address Plaintiffs' request for a preliminary injunction.  Id.

On November 17, 2011, Plaintiffs filed a "Renewed Motion for Temporary Restraining Order, Declaratory Relief and Preliminary Injunction."  See dkt. 29.

On November 21, 2011, Plaintiffs filed an amended Complaint against Defendants, asserting three causes of action for (1) "Interference with the Right to Peaceably Assemble, the Right of Speech; and, the Right to Petition the Government for a Redress of Grievances; for Declaratory Relief (First and Fourteenth Amendments; California Constitution, Art. 1, §§ 1-3[ ])," (2) "Interference with the Right to Peaceably Assemble, the Right of Speech; and, the Right to Petition the Government for a Redress of Grievances; for Injunctive Relief (First and Fourteenth Amendments; 42 U.S.C. § 1983; California Constitution, Art. 1, §§ 1-3)" and (3) "violation of the Due Process Clause of the Fourteenth Amendment Procedural Due Process."  See dkt. 31.

2

United States District Court
For the Northern District of California

On November 22, 2011, Plaintiffs filed a "Motion for Temporary Restraining Order During Pendency of the Motion for Preliminary Injunction," in which they requested "a TRO, although a much more limited TRO, in the nature of a 'truce agreement.'" See dkt. 33.

In an Order issued November 23, 2011, the Court denied Plaintiffs' November 17, 2011 Motion as having been directed at the original Complaint, which was rendered inoperative by the filing of the amended Complaint. See dkt. 36. The Court further denied Plaintiffs' November 22, 2011 Motion, but deemed that Motion to be the operative motion for preliminary injunction and directed the parties to abide by the briefing schedule set forth in the Court's November 15, 2011 Order. Id.

On November 24, 2011, Plaintiffs filed a Motion for Reconsideration of the Court's November 23, 2011. See dkt. 33. On December 2, 2011, the Court denied Plaintiffs' Motion for Reconsideration but modified the previous briefing schedule to expedite the reply deadline and hearing date on Plaintiffs' Motion for Preliminary Injunction. See dkt. 41.

On December 2, 2011, Defendants filed a lengthy (53-page) Opposition to Plaintiffs' Motion for Preliminary Injunction. See dkt. 42. On December 5, 2011, Plaintiffs filed their Reply to Defendants' Opposition. See dkt. 75.[1] Then, on December 7, 2011, the Court entered an Order finding it necessary to recuse all of the judges in the Eastern District of California from hearing this case. See dkt. 86. Accordingly, all then-pending dates were vacated. Id. The case was subsequently reassigned to this Court, see dkt. 89, and, following consultation with the parties, the hearing on the Motion for Preliminary Injunction was set for, and held, Monday, December 12, 2011.

## II.     LEGAL STANDARD

Federal Rule of Civil Procedure 65(a) governs the issuance of preliminary injunctions. To obtain a preliminary injunction, a plaintiff "must establish that he is likely to succeed on

---

[1] Plaintiffs assert that their Reply is "very brief" because of limited time for filing, complaining that Defendants, in contrast, had weeks to prepare their Opposition. See dk. 75 at 2. They ask that "If any point of law or fact is unclear or found to be without evidence on Plaintiffs' side, Plaintiffs request time to submit such evidence or points, in the interest of justice." Id. But it was Plaintiffs who urged an expedited briefing schedule (understandably; they believe their Constitutional rights are being violated). The Court will therefore decide the Motion on the current record.

3

United States District Court
For the Northern District of California

the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20 (2008). "A preliminary injunction is an extraordinary remedy never awarded as a matter of right. In each case, courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.' 'In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction.'" Id. at 24 (internal citations omitted). The Ninth Circuit has adopted a sliding scale approach to preliminary injunctions in which "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1131 (2011).[2]

There are two types of facial constitutional challenges. "First, a plaintiff seeking to vindicate his own constitutional rights may argue that an ordinance 'is unconstitutionally vague or . . . impermissibly restricts a protected activity.'" See Santa Monica Food Not Bombs, 450 F.3d 1022, 1033 (9th Cir. 2006) (quoting Foti v. City of Menlo Park, 146 F.3d 629, 635 (9th Cir. 1998)). "Second, 'an individual whose own speech or expressive conduct may validly be prohibited or sanctioned is permitted to challenge a statute on its face because it also threatens others not before the court.'" Santa Monica Food Not Bombs, 450 F.3d at 1033 (quoting Brockett v. Spokane Arcades, Inc., 472 U.S. 491, 503 (1985). The Court understands Plaintiffs to be raising the first type of facial challenge.

---

[2] Defendants argue that Cottrell is not good law, because "the United States Supreme Court categorically rejected the 9th Circuit's more lenient 'sliding scale' approach." See dkt. 42 at 21-21. But the language Defendants cite from Winter rejects the notion that a preliminary injunction may be granted when a party has demonstrated only "a possibility of irreparable harm." See id. at 21 (quoting Winter, 555 U.S. 7, 22-23); see also Stormans, Inc. v. Selecky, 586 F.3d 1109, 1127 (9th Cir. 2009) (clarifying that likelihood of irreparable injury, not possibility of such injury, is the standard post-Winter). Although Defendants devote several pages to this issue, it is not terribly significant: (1) Plaintiffs do not argue for a "possibility of irreparable harm" standard; and (2) if Plaintiffs succeed in demonstrating a likelihood of success on the merits, irreparable harm will not be a difficult hurdle to clear. See Elrod v. Burns, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.").

**United States District Court**
For the Northern District of California

1    "An as-applied challenge contends that the law is unconstitutional as applied to the

2    litigant's particular speech activity, even though the law may be capable of valid application

3    to others."  See Foti, 146 F.3d at 635 (citing Members of City Council v. Taxpayers for

4    Vincent, 466 U.S. 789, 803 & n.22 (1984)).

5    **III.    APPLICABLE FIRST AMENDMENT PRINCIPLES**

6          The First Amendment provides, "Congress shall make no law . . . abridging the

7    freedom of speech . . . ."  U.S. Const., Amdt. 1.  It applies to states and local governments

8    under the Due Process Clause of the Fourteenth Amendment.  Gitlow v. New York, 268 U.S.

9    652, 666 (1925).  However, "protected speech is not equally permissible in all places and at

10   all times.  Nothing in the Constitution requires the Government freely to grant access to all

11   who wish to exercise their right to free speech on every type of Government property without

12   regard to the nature of the property or to the disruption that might be caused by the speaker's

13   activities."  Cornelius v. NAACP Legal Def. and Educ. Fund, Inc., 473 U.S. 788, 799-800

14   (1985).  Speech restrictions imposed by the government on government property are

15   analyzed under a "forum-based approach."  Int'l Soc. for Krishna Consciousness, Inc. v. Lee,

16   505 U.S. 672, 678 (1992).  Under this approach, the restrictions the government may impose

17   depend upon the "nature of the property."  See Cornelius, 473 U.S. at 799-800.

18         The Supreme Court has established three categories of property: the traditional public

19   forum, the designated public forum and the nonpublic forum.  Id. at 802.  "Traditional public

20   fora are defined by the objective characteristics of the property, such as whether, 'by long

21   tradition or by government fiat,' the property has been 'devoted to assembly and debate.'  . . .

22   Designated public fora, in contrast, are created by purposeful government action.  'The

23   government does not create a [designated] public forum by inaction or by permitting limited

24   discourse, but only by intentionally opening a nontraditional public forum for public

25   discourse.'  . . . Other government properties are either nonpublic fora or not fora at all."

26   Arkansas Educ. Television Com'n v. Forbes, 523 U.S. 666, 677 (1998) (internal citations

27   omitted).  In this case, the parties do not dispute that Courthouse Park, as a public park that

28   surrounds and provides access to a seat of a judicial power (the Fresno Superior Court), has

**United States District Court**
For the Northern District of California

1   the physical and objective characteristics of a traditional public forum and is therefore

2   subject to heightened First Amendment protections.  "The protections afforded by the First

3   Amendment are nowhere stronger than in street and parks, both categorized for First

4   Amendment purposes as traditional public fora."  Berger v. City of Seattle, 569 F.3d 1029,

5   1035-36 (9th Cir. 2009).

6          "In these quintessential public forums, the government may not prohibit all

7   communicative activity.  For the state to enforce a content-based exclusion it must show that

8   its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to

9   achieve that end."  Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45

10  (1983) (internal citation omitted).  This standard is one of "strict scrutiny."  Brown v. Entm't

11  Merchs. Ass'n, -- U.S. --, 131 S.Ct. 2729, 2738 (2011).  A content-based exclusion will not

12  satisfy strict scrutiny "when less speech-restrictive means exist to achieve the interest."  U.S.

13  v. Alvarez, 617 F.3d 1198, 1216 (9th Cir. 2010) (citing Reno v. American Civil Liberties

14  Union, 521 U.S. 844, 874 (1997)).  "The state may also enforce regulations of the time,

15  place, and manner of expression which are content-neutral, are narrowly tailored to serve a

16  significant government interest, and leave open ample alternative channels of

17  communication."  Perry, 460 U.S. at 45.  This standard is one of "intermediate scrutiny."

18  United Broth. of Carpenters & Joiners of Am. Local 586 v. Nat'l Labor Relations Bd., 540

19  F.3d 957, 963 (9th Cir. 2008).  Under intermediate scrutiny, "a regulation of the time, place,

20  or manner of protected speech . . . need not be the least restrictive or least intrusive means of

21  doing so.  Rather, the requirement of narrow tailoring is satisfied 'so long as the . . .

22  regulation promotes a substantial government interest that would be achieved less effectively

23  absent the regulation.'"  Ward v. Rock Against Racism, 491 U.S. 781, 798-99 (1989)

24  (footnote omitted).

25         "[T]he 'principal inquiry in determining content neutrality, in speech cases generally

26  and in time, place, or manner cases in particular, is whether the government has adopted a

27  regulation of speech because of agreement or disagreement with the message it conveys.' "

28  Ward, 491 U.S. at 791 (quoting Clark v. Cmty. for Creative Non-Violence, 468 U.S. 288,

United States District Court
For the Northern District of California

295 (1984)).  "[W]hether a statute is content neutral or content based is something that can be determined on the face of it; if the statute describes speech by content then it is content based." <u>City of L.A. v. Alameda Books, Inc.</u>, 535 U.S. 425, 448 (2002).  "As a general rule, laws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content based." <u>Turner Broad. Sys., Inc. v. F.C.C.</u>, 512 U.S. 622, 643 (1994); <u>see also</u> <u>Berger</u>, 569 F.3d at 1051 ("A regulation is content-based if either the underlying purpose of the regulation is to suppress particular ideas . . . or if the regulation, by its very terms, singles out particular content for differential treatment"). Regulations requiring enforcement authorities to "necessarily examine the content of the message that is conveyed" are content based.  <u>F.C.C. v. League of Women Voters of Cal.</u>, 468 U.S. 364, 383 (1984).  Content based regulations may also be identified where they "effectively drive certain ideas or viewpoints" from the forum.  <u>Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.</u>, 502 U.S. 105, 116 (1991).  "By contrast, laws that confer benefits or impose burdens on speech without reference to the ideas or views expressed are in most instances content neutral." <u>Turner</u>, 512 U.S. at 643 (citing <u>Members of City Council of L.A.</u>, 466 U.S. at 804).

This Order now turns to the merits of Plaintiffs' Motion for Preliminary Injunction, keeping in mind that, although Plaintiffs, as the moving party, have the burden of establishing the elements necessary to obtain injunctive relief, Defendants, as the party seeking to uphold the ordinances, bear the burden of justifying their restrictions on speech. <u>See</u> <u>Klein v. City of San Clemente</u>, 584 F.3d 1196, 1201 (9th Cir. 2011) (citing <u>Kaufman v. ACS Sys., Inc.</u>, 110 Cal. App. 4th 886 (2003) and <u>S.O.C. v. Cnty. of Clark</u>, 152 F.3d 1136, 1146 (9th Cir. 1998)).

## IV.   DISCUSSION

Plaintiffs have challenged the constitutionality of sections 13.20.020, 13.20.030, 13.20.060 (C) and (K), and 13.24.010(B)(4) of the Fresno County Code of Ordinances ("FCCO").  <u>See generally</u> dkt. 6.  This Order first discusses the issue of Younger Abstention,

and then discusses each preliminary injunction factor, focusing chiefly on the likelihood of success on the merits.

### A.  Younger Abstention

As a preliminary matter, Defendants argue in their briefing that the Court should not resolve the case, but abstain under Younger v. Harris, 401 U.S. 37 (1971).  See dkt. 42 at 52. The Court in Younger, 401 U.S. at 45 (citing Fenner v. Boykin, 271 U.S. 240, 244 (1926)), explained that "the normal thing to do when Federal courts are asked to enjoin pending proceedings in State courts is not to issue such injunctions."

Ninth Circuit authority clarifies that Younger does not apply until a state court proceeding has begun.  See, e.g., M&A Gabaee v. Cmty. Redevelopment Agency of City of L.A., 419 F.3d 1036, 1040 (9th Cir. 2005) ("In Hicks, for instance, the Court held abstention to be appropriate 'where state . . . proceedings are begun against the federal plaintiffs."  It is self-evident that, absent some unusual use of language, a lawsuit begins when it is filed.") (internal citations omitted); Agriesti v. MGM Grand Hotels, Inc., 53 F.3d 1000, 1001 (9th Cir. 1995) (holding that before Younger can be applied, "there must be ongoing state judicial proceedings," and concluding that "[b]ecause no action has been filed in state court against defendants, there are no ongoing state judicial proceedings to which this court can defer."). Defendants conceded at the motion hearing that no state court judicial proceedings have begun.  Younger abstention is therefore inappropriate.

### B.  Likelihood of Success on the Merits

Having determined that Younger does not present a bar to resolving the case, this Order next addresses Plaintiffs' likelihood of success.  See Winter, 555 U.S. at 20 (plaintiff "must establish that he is likely to succeed on the merits").  The Order discusses first the content neutrality of the challenged ordinances, and then the sections themselves.

#### 1.  Content Neutrality of the Challenged Ordinances

Indisputably, none of the ordinances challenged by Plaintiffs describe speech by content on their face.  They do not they distinguish favored speech from disfavored speech on the basis of the ideas or views expressed by permit applicants.  Nor do they discriminate

United States District Court
For the Northern District of California

based on the applicants' identities.  The ordinances do not require the Fresno County

administrative officer to necessarily examine the content of the message conveyed.

Accordingly, the ordinances are content neutral and subject to intermediate scrutiny.[3]  Thus,

the ordinances need only be "narrowly tailored to serve a significant government interest,

and leave open ample alternative channels of communication."  Perry, 460 U.S. at 45; Ward,

491 U.S. at 791.  Again, the ordinances need not be the least restrictive or intrusive means of

serving those interests so long as the interests would be achieved less effectively absent the

ordinances.  Ward, 491 U.S. at 798-99.  However, they must not "burden substantially more

speech than is necessary to further the government's legitimate interests."  Id. at 799.

### 2.    Constitutionality of FCCO §§ 13.20.020 and 13.20.030

Section 13.20.020 provides: "Public Meeting – Defined.  As used in this chapter,

'public meeting' means the assemblage of ten or more persons by prearrangement, common

design or as a result of advertising, solicitation or other promotion."  FCCO § 13.20.020.

Section 13.20.030 provides: "Public Use – Permit. It is unlawful for any person to assemble

or participate in a public meeting in the Courthouse Park as described in Section 13.20.020

---

[3]  Section 13.20.030 provides that permits must be issued in accordance with section 13.24.020, and section 13.24.020 provides, among other things, that permits shall be denied if "[t]he proposed public use will necessarily result in a violation of County Ordinance Code Section 3.08.110 prohibiting certain types of political activities on county premises relating to elections."  FCCO §§ 13.20.030, 13.24.020(4).  Section 3.08.110 essentially prohibits Fresno County employees from engaging in any political activity in connection with an election while on county property or within the scope of their employment.  See FCCO § 3.08.110(A)(1)-(7).  Section 3.08.110 does not distinguish activity on the basis of political content or partisanship and is therefore viewpoint neutral, although sections 13.24.020 and 3.08.110, read together, would appear to differentiate between classes of speakers.  However, "even a statute that facially distinguishes a category of speech or speakers is content-neutral if justified by interests that are 'unrelated to the suppression of free expression.' " DISH Network Corp. v. F.C.C., 653 F.3d 771, 778 (9th Cir. 2011) (quoting City of Renton v. Playtime Theatres, Inc., 475 U.S. 41, 48 (1986)).  As Justice Stevens noted in his dissent in Citizens United v. Fed. Election Com'n, 130 S.Ct. 876 (2010), the Supreme Court has "consistently approved laws that bar Government employees . . . from contributing to or participating in political activities. These statutes burden the political expression of one class of speakers, namely, civil servants.  Yet we have sustained them on the basis of longstanding practice and Congress' reasoned judgment that certain regulations which leave 'untouched full participation . . . in political decisions at the ballot box,' help ensure that public officials are 'sufficiently free from improper influences,' and that 'confidence in the system of representative Government is not . . eroded to a disastrous extent,' [citation.]" Id. at 947 (concurring and dissenting opinion of Stevens, J.).  Courts have upheld prohibitions on political activity by government employees while on duty or on government property simply because of these interests.  See, e.g., Civil Service Comm'n v. Letter Carriers, 413 U.S. 548, 562-67 (1973); Broadrick v. Oklahoma, 413 U.S. 601, 606-08, (1973).  Therefore, section 3.08.110's prohibition on employee political activity does not render section 13.24.020 content based.

9

**United States District Court**
For the Northern District of California

1  except pursuant to a permit for such meeting as provided for in Section 13.24.020 of this

2  code." FCCO § 13.20.030.  Plaintiffs contend that the ordinances cannot withstand

3  constitutional scrutiny "[b]ecause the 10-person rule does not relate to any legitimate state

4  purpose whatsoever."  See dkt. 13 at 15.  Plaintiffs further contend the ordinances were

5  unconstitutionally applied by Defendants.  Id.

6  **a.      Facial Challenge to FCCO §§ 13.20.020 and 13.20.030**

7  Plaintiffs first assert a facial challenge to the constitutionality of sections 13.20.020

8  and 13.20.030, contending that those sections cannot withstand constitutional scrutiny

9  because a permit requirement for public meetings involving as few as ten people does not

10  serve any legitimate government interests.  Id.  But the Ninth Circuit has observed that

11  permit requirements for traditional public fora do serve substantial government interests: "In

12  public open spaces . . . , permit requirements serve not to promote traffic flow but only to

13  regulate competing uses and provide notice to the municipality of the need for additional

14  public safety and other services."  Santa Monica Food Not Bombs, 450 F.3d at 1042; see also

15  Berger, 569 F.3d at 1041.  Defendants have an interest in regulating competing uses of

16  Courthouse Park to ensure that no ideas or viewpoints are driven from the forum.  They also

17  have an interest in knowing when competing uses will occur so that they can safely oversee

18  them.

19  In addition to these interests, Defendants have established that the Courthouse Park

20  permitting scheme was designed – decades ago[4] – to promote public health, safety and

21  welfare.  Plaintiffs "concede the minor point that the government has an interest in regulating

22  health and safety."  See dkt. 75 at 4.  "[I]t is clear that a State's interest in protecting the

23  'safety and convenience' of persons using a public forum is a valid governmental objective."

24  Heffron v. Int'l Soc. for Krishna Consciousness, Inc., 452 U.S. 640, 650 (1981) (quoting

25  Grayned v. City of Rockford, 408 U.S. 104, 115 (1972)); see also Thomas v. Chi. Park Dist.,

26  534 U.S. 316, 323 (2002) ("Regulations of the use of a public forum that ensure the safety

27  _____

28  [4] See dkt. 42 at 26 ("Here, FCOC Chaps. § 13.20 (Courthouse Park) and § 13.24 (Grounds and Buildings) were enacted and amended by five (5) Board actions taken between 1962 and 1985.  (Seidel Dec., ¶¶ 3, 4).").

1    and convenience of the people are not inconsistent with civil liberties but . . . [are] one of the

2    means of safeguarding the good order upon which [civil liberties] ultimately depend.")

3    (internal citations omitted).

4        The evidence shows that public health and safety were affected by the increased

5    presence of individuals at Courthouse Park generally, and by the presence of Plaintiffs in

6    particular.  For example, Plaintiffs' presence was accompanied by an increase in human

7    waste and trash.  <u>See</u> dkt. 42 at 7-15 (describing scene at Courthouse Park).  Section

8    13.20.060 contains several subsections unchallenged by Plaintiffs that are clearly designed to

9    ameliorate problems such as these.  <u>See, e.g.</u>, FCCO § 13.20.060(E) (making it unlawful

10   "[t]o throw or place any newspapers, bottle or refuse matter of any kind . . . upon the grounds

11   of Courthouse Park") and (F) (making it unlawful to "write, print, cut . . . or otherwise mark

12   in or upon . . . any . . . property whatsoever within the park").

13       The issue here, however, is not whether a permit requirement for ten persons serves a

14   substantial government interest, but whether a permit requirement for groups of as few as ten

15   persons is <u>sufficiently narrowly tailored</u> to pass constitutional muster, given that Courthouse

16   Park is a traditional public forum.  The interests served by permit requirements are typically

17   implicated "[o]nly for quite large groups" and thus "permissible only as to those groups."

18   <u>Santa Monica Food Not Bombs</u>, 450 F.3d at 1042.  The Ninth Circuit appears to hold that

19   permit requirements for groups of fewer than ten individuals are unconstitutional or

20   constitutionally infirm, whereas those for groups of fifty or greater are narrowly tailored.

21       In <u>Santa Monica Food Not Bombs</u>, 450 F.3d at 1043, the Ninth Circuit invalidated as

22   insufficiently narrowly tailored a Santa Monica ordinance that required any individual

23   advertising a community event via radio, television or print media to obtain a permit

24   regardless of the number of actual attendees.  By contrast, the court held that a related

25   ordinance imposing permit requirements for groups of 150 or more persons was narrowly

26   tailored because "[g]roups of 150 or more . . . are by any measure sufficiently large enough

27   to affect or 'have an impact on' the use of Santa Monica's public spaces by other citizens and

28   therefore to implicate the City's interest in maintaining the safe and compatible use of limited

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

public open space." Id.  Similarly, in Long Beach Area Peace Network v. City of Long Beach, 574 F.3d 1011, 1034 (9th Cir. 2009), the court, relying principally on Santa Monica Food Not Bombs, found that a Long Beach ordinance requiring a permit for "organized assemblages" of 75 or more persons in a public place was narrowly tailored to serve the government's significant interest in regulating competing uses because 75 persons was "large enough to warrant an advance notice and permitting requirement."  In Berger, 569 F.3d at 1035, the court affirmed the invalidation of a permit requirement for solo street performers at the Seattle Center.  In "affirm[ing] the principle that an advance notification requirement applicable to speech in a public forum must be limited to larger groups," id. at 1058, the court observed that the Supreme Court and most other circuits have never upheld single-speaker permit requirements, id. at 1040.  And in Grossman v. City of Portland, 33 F.3d 1202, 1204, 1207 n.13 (9th Cir. 1994), the court suggested that permitting schemes for fifty or more persons would be much more narrowly tailored than the ordinance at issue in that case, which required that permits be obtained for protests involving as few as six to eight people.  See also Douglas v. Brownel, 88 F.3d 1511, 1524 (8th Cir. 1996)[5] ("applying the permit requirement to groups as small as ten persons compounds our conclusion that the . . . ordinance is not narrowly tailored.").

Although the number of persons in the permit requirement ordinance is the crucial consideration, it is not necessarily dispositive.  "[C]onsideration of a forum's special attributes is relevant to the constitutionality of a regulation since the significance of the governmental interest must be assessed in light of the characteristic nature and function of the particular forum involved."  Heffron, 452 U.S. at 650-51; cf. Long Beach Peace Area Network, 574 F.3d at 1034 ("Advance notice and permitting requirements applicable to smaller groups would likely be unconstitutional, unless . . . the public space in question was so small that even a relatively small number of people could pose a problem of regulating competing uses.").

---

[5] Douglas was cited approvingly in Santa Monica Food Not Bombs, 450 F.3d at 1042-43.

The evidence demonstrates that Courthouse Park is 13 acres in size, much of it covered by grass, shrubs and trees.  See Thompson Decl. ¶ 3.  Some of the acreage in Courthouse Park is consumed by the footprints of large buildings, including the Hall of Records, the Fresno Superior Court and jail facilities.  Id.  The park also includes a fountain, "large expanses of grass," trees, benches and statues.  Id.  The parks in Santa Monica Food Not Bombs, 450 F.3d at 1026, were comprised of 245 acres of public open space, and the venue in Berger, 569 F.3d at 1035, was eighty acres, including twenty-three acres of outdoor public park space.  No acreage was mentioned in Long Beach Area Peace Network, 574 F.3d at 1034, but the Ninth Circuit in that case found that it was a "close question" whether "a group of seventy-five people using a public open space in Long Beach is large enough to warrant an advance notice and permitting requirement."

Although Courthouse Park is smaller than some of the parks discussed above, Defendants have not demonstrated that its 13 acres are so cluttered with buildings, trees and statues that a group of 10 people could truly "pose a problem of regulating competing uses." See Long Beach, 574 F.3d at 1034.  To the contrary, the Defendants' own witnesses describe "large expanses of grass" in the Park, see Thompson Decl. ¶ 3, and describe Plaintiffs' encampment as located "at a columnar structure near the southern boundary of Courthouse Park," see Andreotti Decl. ¶ 3, rather than monopolizing a significant portion of the Park. Defendants have pointed to no "special attributes" of Courthouse Park, see Heffron, 452 U.S. at 650-51, that take it outside of the rule that "permitting requirements applicable to smaller groups would likely be unconstitutional," Long Beach Peace Area Network, 574 F.3d at 1034.

Nor have Defendants demonstrated that a group of 10 people could be so unruly as to "constitute[] . . . a threat to the safety and convenience of park users."  See Grossman, 33 F.3d at 1207; see also id. n.13 (collecting "much more narrowly tailored" ordinances from other cities, requiring permits for groups of 150, 50, and 50).  The Court observed at the motion hearing that the ordinance's reference to 10 people struck it as entirely arbitrary and

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    nonsensical.[6]  As the Court commented, a class of school children is typically more than 10

2    people; that a teacher would need a permit to gather her students at the Park strikes the Court

3    as absurd.

4           Although Defendants have significant interests in regulating the size of groups at

5    Courthouse Park, the sections at issue "burden substantially more speech than is necessary to

6    further the government's legitimate interests."  See Ward, 491 U.S. at 799.  Accordingly, the

7    Court concludes that sections 13.20.020 and 13.20.030 are not narrowly tailored, and

8    therefore unconstitutional.  The Court notes that Defendants' counsel did not defend these

9    sections at the motion hearing, essentially conceding their unconstitutionality.

10                    **b.      As-Applied Challenge to FCCO §§ 13.20.020 and 13.20.030**

11          Plaintiffs further assert an as-applied challenge to sections 13.20.020 and 13.20.030,

12   contending that the 10-person threshold rule has not been applied to all groups meeting in

13   Courthouse Park.  A plaintiff may challenge a content-neutral regulation by demonstrating

14   that, "in its implementation, there emerged a 'pattern of unlawful favoritism.' " Long Beach

15   Peace Area Network, 574 F.3d at 1029 (citing Thomas, 534 U.S. at 324-25; see also

16   McGuire v. Reilly, 386 F.3d 45, 64 (1st Cir. 2004).  The Court's research did not reveal any

17   Ninth Circuit authority clarifying Plaintiffs' burden of production, but a recent Third Circuit

18   decision is instructive on this issue.  In Brown v. City of Pittsburgh, 586 F.3d 263, 293 (3d

19   Cir. 2009) (emphasis original), the court held that in order to demonstrate a pattern of

20   unlawful favoritism, the challenger "must prove not merely that the . . . enforcement of the

21   Ordinance has tended to fall more heavily on those who advocate one viewpoint . . . than on

22   those who advocate another . . . ; [the challenger] must also prove that such enforcement

23   occurred because of the viewpoint expressed.  That is, [the challenger] must show an intent

24   to discriminate on the basis of viewpoint."  This requirement, according to the Third Circuit,

25   stems from the Supreme Court's observation in Ward that " '[a] regulation that serves

26   purposes unrelated to the content of expression is deemed neutral, even if it has an incidental

27

28

_____

          [6] To the Defendants' credit, they did not disagree.

United States District Court
For the Northern District of California

1    effect on some speakers or messages but not others.'" Id. at 293 (quoting Ward, 491 U.S. at

2    791).  The reasoning of Brown is persuasive.

3          In support of their contention, Plaintiffs submit the declaration of Pam Whalen, who

4    was formerly employed by the Service Employee International Union ("SEIU") to represent

5    Fresno County employees and negotiate collective bargaining agreements with Fresno

6    County on the employees' behalf, and to organize rallies before and after meetings of the

7    Fresno County Board of Supervisors.  See dkt. 75-6 ¶ 2.[7]  Whalen states that during her time

8    with SEIU, she organized numerous events at Courthouse Park and other locations without

9    seeking or obtaining permits.  Id. ¶ 3.  According to Whalen, no representative of Fresno

10   County ever contacted her regarding the need for a permit, despite the fact that many of the

11   SEIU rallies involved more than ten participants.  See id. ¶¶ 3,4.  However, Defendants assert

12   that "[c]ontrary to plaintiffs' assertions . . . , SEIU has, and usually does, obtain a permit to

13   engage in a public meeting at that location."  Dkt. 42 at 27 (citing Morris Decl. ¶ 8).  To the

14   extent that there is a dispute of fact about this issue, it precludes the granting of Plaintiffs'

15   Motion on this ground.  See Int'l Molders' and Allied Workers' Local Union No. 164 v.

16   Nelson, 799 F.2d 547, 551 (9th Cir. 1986) (internal citations omitted) ("In deciding a motion

17   for preliminary injunction, the district court 'is not bound to decide doubtful and difficult

18   questions of law or disputed questions of fact.'").  The Court concludes that, at most,

19   Plaintiffs' evidence establishes that Defendants' enforcement of sections 13.20.020 and

20   13.20.030 fell more heavily on Plaintiffs than on SEIU.  Plaintiffs have provided no

21   compelling evidence[8] that Defendants' actions were driven by discriminatory animus.  Thus,

22   Plaintiffs have failed to show a pattern of unlawful favoritism.

23

24          [7] Defendants object to the Whalen Declaration, arguing that Whalen lacks personal knowledge.
     See dkt. 95.  The Court denies this objection.

25

26          [8] Plaintiffs' strongest evidence is a news report in which Sheriff Margaret Mims allegedly stated,
     following the arrest of 13 Occupy Fresno protestors on Sunday, November 6,"We chose today because
27   it was the time with the least chance of violence, pleased with the turn out, they met their mission and
     we will keep deputies out there this weekend to make sure they don't come back."  See Martinez Decl.
28   (dkt. Ex. 76-2) Ex. B (11/6/11 transcript of KFSN report) (emphasis added).  This interview is subject
     to various interpretations, including that the Sheriff hoped to keep protestors from coming back after
     midnight.  In any case it is not conclusive evidence of animus.

### 3.   Constitutionality of FCCO § 13.20.060(C) and (K)

Section 13.20.060 provides in pertinent part: "It is unlawful for any person whether in connection with a public meeting or otherwise to do any of the acts hereinafter enumerated within the limits of Courthouse Park: . . . C.  To loiter in the park or be therein for any other purpose than to pass through the park on the walks thereof between the hours of twelve midnight and six a.m. of the next succeeding day; . . . K. To camp or lodge therein or make or kindle a fire for any purpose unless pursuant to a permit for a public meeting issued therefor by the county administrative officer as in this chapter provided[.]"  FCCO § 13.20.060(C), (K).

Plaintiffs contend that subsection (C) renders section 13.20.060 unconstitutional because it prohibits Plaintiffs from remaining in Courthouse Park on a 24-hour basis, in accordance with the Occupy movement's practice of around-the-clock demonstrations, but does not "leave open ample alternative means of expressive conduct to reach Plaintiffs' intended audience."  See generally dkt. 13.  Plaintiffs further argue that the ordinance was unconstitutionally applied by Defendants because Plaintiffs' request for a 24-hour use permit "was denied without reason and without a decision-making framework" and because they "have been arrested for remaining in Courthouse Park, under inapplicable criminal laws relating to 'lodging' in another person's property."  Id. at 1.[9]  Plaintiffs argue that subsection (K) renders section 13.20.060 unconstitutional on its face because it "provides unbridled discretion to the administrative officer of the County to grant or deny permits to persons asking to camp or lodge in the park."  Id. at 15-16.

//

//

---

[9] Plaintiffs argued for the first time at the motion hearing that the section is also unconstitutional because it does not define the word "loiter," relying on City of Chicago v. Morales, 527 U.S. 41, 56 (1999).  But Morales, 527 U.S. at 55, involved "a criminal law that contains no *mens rea* requirement, . . . and infringes constitutionally protected rights."  The Supreme Court in Morales commented that the Illinois Supreme Court had "recognized that the term 'loiter' may have a common and accepted meaning, but the definition of that term in the ordinance – 'to remain in any one place with no apparent purpose' – does not."  Id. at 56.  The section at issue here does not suffer from the same infirmities.  This Court also does not understand Plaintiffs to be arguing that California's loitering statute, Penal Code § 647(e), is itself unconstitutionally vague.

United States District Court

For the Northern District of California

a.      Facial Challenge to FCCO § 13.20.060(C)

Plaintiffs challenge the constitutionality of section 13.20.060, subsection (C),

asserting that the prohibition on loitering or being in Courthouse Park between twelve a.m.

and six a.m. for any purpose other than to pass through the Park does not leave open ample

alternative channels for Plaintiffs to carry out their stated goal of conducting 24-hour vigils,

or to reach their intended audience.  See id. at 20-22 ("because of the broad context and

content of expressive conduct in the Occupy Movement, a ban on 24-hour presence and

peaceable vigil at Courthouse Park in Fresno would leave no ample alternative means to

reach Plaintiffs' intended audience").  Not so.

The evidence in the record shows that there were ample alternative channels of

communication for Plaintiffs.  Courthouse Park is surrounded on all sides by public streets

and sidewalks owned by the City of Fresno.  See dkt. 55 ¶ 4.  Defendants represented at the

motion hearing that the County has no jurisdiction over those sidewalks.  Plaintiffs could

have conveyed their message from these venues without any of the limitations imposed by

Defendants.  Indeed, Gregg Andreotti, the Fresno County Sheriff's Office ("FSO") lieutenant

in charge of supervising enforcement of camping laws at Courthouse Park, states in his

declaration that FSO issued dispersal orders to persons at the Occupy Fresno encampment in

advance of any arrests between midnight and six a.m.  See dkt. 43.  According to Andreotti,

persons in the encampment could have complied with the dispersal order and avoided arrest

simply by moving to a city-owned sidewalk.  Id. ¶ 5.[10]

---

[10] Plaintiffs made several arguments on this point for the first time at the motion hearing . First, Plaintiffs argued that the Defendants' suggestion that protestors move to sidewalks 20 feet away between the hours of midnight and 6:00 a.m. undermines their professed interest in security.  The Court does not agree, as it has no trouble believing that sidewalks are safer than parks in the middle of the night, that Defendants could reasonably conclude that they do not wish to spend County funds on increased law enforcement for the Park at night, and that – despite Plaintiffs' counsel's contention to the contrary – more crime occurs at night than during the day.  Plaintiffs' argument that the City is considering adding a permit system is too speculative to be persuasive.  If the City implements a permit system and if that permit system is constitutionally infirm, that would be significant; as neither has happened, the Court is unmoved.  Finally, Plaintiffs' assertion that Plaintiff Dallas Blanchard walked to a sidewalk and was arrested is (1) disputed in the declaration of the arresting Deputy Sheriff, see dkt. 47, and therefore not subject to the granting of a Motion for Preliminary Injunction, see Int'l Molders' & Allied Workers' Local Union No. 164, 799 F.2d at 551, as well as (2) likely Blanchard's defense to any ensuing charge, and it is not the function of this Court to determine whether Blanchard violated the

United States District Court
For the Northern District of California

The First Amendment does not "guarantee the right to communicate one's views at all times and places or in any manner that may be desired." See Heffron, 452 U.S. at 647. Although Plaintiffs wish to communicate their views from the Park 24 hours a day, the Court concludes that their ability to protest there for 18 hours a day, and to protest in the surrounding sidewalks for the remaining six hours a day, provides them with ample alternative channels of communication. Plaintiffs are not entitled to remain in Courthouse Park for 24 hours a day.[11] See Clark, 468 U.S. at 296 ("we seriously doubt that the First Amendment requires the Park Services to permit a demonstration in [the park] involving a 24-hour vigil and the erection of tents to accommodate 150 people."); Roulette v. City of Seattle, 97 F.3d 300, 303 (9th Cir. 1996) (neither sitting or lying on sidewalk during hours between 7:00 a.m. and 9:00 p.m. are "integral to or commonly associated with expression"); dkt. 70 Ex. A (Memorandum and Order from Occupy Sacramento, et al. v. City of Sacramento, et al., Case No. 2:11-cv-02873-MCE-GGH (dkt. 17 in that case)) at 16 (concluding that ordinance limited to city parks and limited to the hours between 11:00 p.m. and 5:00 a.m. "does not prevent Plaintiffs from conducting their expressive activities twenty-four hours a day on adjoining sidewalks or in other public spaces if they so choose" and was therefore "not over-broad");[12] see also Vietnam Veterans Against The War/Winter Soldier Org. v. Morton, 506 F.2d 53, 57-58 (D.C. Cir. 1974) ("The permit obtained by the VVAW allows its members to propound their views by assembling, speaking, pamphleteering, parading, carrying banners, and erecting whatever structures they deem necessary to effective

---

law, but whether the ordinances at issue violate the Constitution.

[11]  One additional note: at the motion hearing, Plaintiff's counsel asserted that protestors remained standing at all times; when the Court asked her how that was possible, she explained that protestors came to the Park in shifts. Accordingly, it is the Court's understanding that although the Occupy Fresno movement intends to maintain a 24-hour presence at the Park, individual protestors do not.

[12]  Plaintiffs asset that much of Judge England's Order in Occupy Sacramento was dicta, because he found that plaintiffs there had sat on their rights and so, because of undue delay, were procedurally barred from getting their desired injunctive relief. See dkt. 39 at 9. Although Judge England did state that "denial of [the plaintiffs'] Motion is warranted here on procedural grounds alone," see dkt. 70 Ex. A at 7, he went on to state that "the Court is loathe to deny Plaintiffs' Motion solely on procedural grounds, so the Court also considers the substance of Plaintiffs' Motion," id. at 12. The Court does not find the remainder of the Order to be dicta.

United States District Court
For the Northern District of California

1   communication of their message.  They are only prohibited from cooking and camping

2   overnight, activities whose unfettered exercise is not crucial to the survival of democracy and

3   which are thus beyond the pale of First Amendment protection.").

4       Plaintiffs' facial challenge to section 13.20.060(C) fails.

5                  **b.       As-Applied Challenge to FCCO § 13.20.060(C)**

6       Plaintiffs also assert an as-applied challenge to section 13.20.060(C), contending that

7   the ordinance has not been equally applied by Defendants.  In support of this contention,

8   Plaintiffs adduce as evidence the declarations of Dallas Blanchard and Georgia Williams,

9   who assert that during the last month, they have observed people remaining in Courthouse

10  Park "between the hours of 12 midnight and 6 a.m., both sleeping and walking around, who

11  have not been ordered to disperse and have not been arrested, and who are not part of

12  Occupy Fresno."  See dkts. 75-4 ¶ 2, 75-5 ¶ 2.  Defendants responded to this assertion at the

13  motion hearing, asserting that when Fresno law enforcement clears the Park between the

14  hours of midnight and 6:00 a.m., it clears everyone it sees, adding that if anyone remains in

15  the Park at that time, law enforcement is not aware of it.[13]  Consistent with the analysis of

16  Plaintiffs' as-applied challenge to FCCO §§ 13.20.020 and 13.20.030 above, to the extent

17  that there is a dispute of fact about this issue, it precludes the granting of Plaintiffs' Motion

18  on this ground.  See Int'l Molders' and Allied Workers' Local Union No. 164, 799 F.2d at

19  551.  In addition, the Court finds that Plaintiffs' evidence does not establish a pattern of

20  unlawful favoritism and is therefore insufficient to demonstrate that section 13.20.060(C)

21  was unconstitutionally applied.

22      Plaintiffs' additional arguments in support of their as-applied challenge are also

23  unavailing.

24      To the extent Plaintiffs complain about the process by which their request for a 24-

25  hour permit was denied, the evidence demonstrates that Defendants have been responsive to

26  Plaintiffs' concerns, even if they have maintained that Plaintiffs are not permitted to stay in

27

28      [13] Defendants did not point to any specific support for this assertion in the record, but the Court
    notes that Defendants asserted at the beginning of the motion hearing that a member of law enforcement
    was present in the courtroom and available to testify, and that the Court declined to hear testimony.

19

United States District Court
For the Northern District of California

the Park after midnight.  John Thompson, the Fresno Resource Manager, described meeting with Plaintiffs about Plaintiffs' intent to apply for a new permit, and even giving Plaintiffs a two-day grace period to apply for a new permit.  See dkt. 55 ¶ 7.  In the Complaint, Plaintiffs acknowledge that they "decided to forego the permit process because of the unacceptable closure hour condition," dkt. 31 ¶ 27, thus cutting the permitting process short.  And at the motion hearing, Plaintiffs' counsel represented that the Fresno Board had expressed its willingness to take up Plaintiffs' displeasure with their permitting process at the next Board meeting (although it would not do so on an emergency basis, as requested).  This process does not strike the Court as improper.

To the extent Plaintiffs complain that they have been arrested "for  remaining in Park under inapplicable criminal laws relating to 'lodging' in another person's property," see dkt. 13 at 1, they have not expanded upon this argument sufficiently for the Court to fully understand or address it.  Nor have Plaintiffs explained to the Court's satisfaction why they were not lodging; that they have apparently not had tents at the Park for weeks, and are "not sleeping" at the Park, see dkt. 75-2 ¶ 2, is not dispositive.  Cf. City of Berkeley v. Cukierman, 14 Cal. App. 4th 1331, 1340 (1993) (noting that "Under dictionary definitions 'lodging' is 'a temporary place to stay' . . . . The case law confirms that lodgers are similar to hotel guests who rent rooms for a temporary stay.") (citations omitted).  Nor is the language cited by Plaintiffs' counsel at the motion hearing that the parks are "for the people."  Parks can be both for the people and closed to the people during certain hours.

Plaintiffs' as-applied challenge to section 13.20.060(C) therefore also fails.

### c.      Facial Challenge to FCCO § 13.20.060(K)

Next, Plaintiffs assert a facial challenge to subsection (K) of section 13.20.060, contending that it provides unbridled discretion to the Fresno County administrative officer to grant or deny permits to persons asking to camp or lodge in Courthouse Park.  "A permitting requirement is a prior restraint on speech and therefore bears a 'heavy presumption' against its constitutionality. . . . The presumptive invalidity and offensiveness of advance notice and permitting requirements stem from the significant burden that they

20

**United States District Court**
For the Northern District of California

1   place on free speech." Berger, 569 F.3d at 1037 (internal citations and quotation marks

2   omitted). Nevertheless, a prior restraint may be permissible if it regulates time, place, and

3   manner of expression rather than content. Thomas, 534 U.S. at 322-23; Santa Monica Food

4   Not Bombs, 450 F.3d at 1036. As noted above, section 13.20.060(K), as with all of the

5   challenged ordinances, is content neutral. What Plaintiffs must intend to suggest, therefore,

6   is that the ordinance is unconstitutional because it allows the county's administrative officer

7   to surreptitiously discriminate against parties requesting a permit to camp based on content.

8       A permitting scheme that "allows arbitrary application is 'inherently inconsistent with

9   a valid time, place and manner regulation because such discretion has the potential for

10  becoming a means of suppressing a particular point of view.' To curtail that risk, 'a law

11  subjecting the exercise of First Amendment freedoms to the prior restraint of a license' must

12  contain 'narrow, objective, and definite standards to guide the licensing authority.' . . . If the

13  permit scheme 'involves appraisal of facts, the exercise of judgment, and the formation of an

14  opinion' by the licensing authority, 'the danger of censorship and of abridgement of our

15  precious First Amendment freedoms is too great' to be permitted." Forsyth County, Ga. v.

16  Nationalist Movement, 505 U.S. 123, 130-31 (1992) (internal citations omitted). "The

17  standards must be sufficient to "render [the official's decision] subject to effective judicial

18  review.' " Long Beach Peace Area Network, 574 F.3d at 1025 (citing Thomas, 534 U.S. at

19  323). "The relevant question is whether the challenged regulation authorizes suppression of

20  speech in advance of its expression." Ward, 491 U.S. at 795 n.5.

21      In the Court's view, the ordinance does not allow the administrative officer to act

22  arbitrarily in deciding whether to grant or deny a permit. Rather, the ordinance provides

23  definite and objective criteria that the administrative officer must follow. Subsection (K) of

24  section 13.20.060, as noted above, provides that it is unlawful to camp, lodge or kindle a fire

25  in the Park "unless pursuant to a permit for a public meeting." Section 13.20.030, which

26  governs the issuance of permits for public meetings, provides that permits shall be issued in

27  accordance with section 13.24.020. Section 13.24.020 provides:

28  //

"Public use – Permit. Persons may apply for a permit to use those portions of county-owned grounds or buildings which are available for public meetings under the provisions of this code, the County Administrative Code, or other local rules and regulations. <u>A permit shall be denied if</u> any of the following condition exist: 1. The proposed public use will necessarily result in a violation of conduct regulations established in this chapter; or, 2. The site of the proposed public use is inadequate in size and shape or is without the sanitary, parking, or other necessary facilities to accommodate such use; or, 3. The proposed public use will have an unreasonable adverse impact on abutting property or the surrounding neighborhood. 4. The proposed public use will necessarily result in a violation of County Ordinance Code Section 3.08.110 prohibiting certain types of political activities on county premises relating to elections."[14]

"Under the statutory construction doctrine of *expressio unius est exclusio alterius,* 'the expression of certain things in a statute necessarily involves exclusion of other things not expressed.'" <u>Blue v. City of L.A.</u>, 137 Cal. App. 4th 1131, 1142-43 (2006) (citing <u>Dyna-Med, Inc. v. Fair Employment Housing Com.</u>, 43 Cal.3d 1379, 1391 n.13 (1987). "In addition, a statute may express the law by 'negative implication.' A negative implication is the unstated but implicitly evident expression of the statute. Thus the expression of some things in a statute necessarily means the exclusion of other things that are not expressed." <u>Spicer v. City of Camarillo</u>, 195 Cal. App. 4th 1423, 1427 (2011) (internal citations omitted). Applying the foregoing principles to the language of section 13.24.020, the Court finds that the ordinance requires permit applications be denied <u>only if</u> one or more of the four enumerated conditions for proposed public uses are found to exist. <u>Compare</u> <u>Mennen v. Easter Stores</u>, 951 F.Supp.838, 865 n.29 (N.D. Iowa 1997) (noting that federal statute providing list of examples of relief "was not exclusive to all other forms of relief, with its inclusion of the phrase 'including, but not limited to' preceding the list"). By negative implication, should none of the four enumerated conditions exist, a permit application <u>must</u> be granted. Under these circumstances, the administrative officer's discretion is curtailed. To be sure, the ordinance vests the officer with some discretion in determining whether any of the foregoing conditions exist. Plaintiffs, however, have not explained how such discretion could conceivably devolve into unbridled discretion.

---

[14] Emphasis added.

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

1    In the alternative, Plaintiff's challenge to this section fails because Plaintiffs

2    represented at the motion hearing that they do not seek a permit to camp overnight, and that

3    camping is a non-issue.  <u>See also</u> dkt. 75 at 2 (Plaintiffs asserting: "This is not a case about

4    Plaintiffs asking to camp overnight, to use tents or to sleep or loiter in the park.").  Accepting

5    Plaintiffs' representation, the Court struggles to see how Plaintiffs have standing to challenge

6    the ordinance section about the provision (or denial) of permits for camping.

7    On either basis, Plaintiff's challenge to section 13.20.060(K) fails.

8    **4.    Constitutionality of FCCO § 13.24.010(B)(4)**

9    Section 13.24.010 provides in pertinent part: "A. Except where otherwise specifically

10   provided for in this title, the administrative officer of the county is authorized to determine

11   and establish conditions and regulations as public convenience, necessity and safety require

12   to regulate the conduct of persons upon the county-owned grounds of any county institution

13   or building and to change the same from time to time as such public convenience, necessity

14   and safety require . . . . B. Such conditions and regulations shall prohibit the following action

15   except where expressly permitted by the administrative officer: . . . 4. <u>Distribute any</u>

16   <u>handbills</u> or circulars or to <u>post, place or erect any bills, notices,</u> paper or advertising devices

17   or matter of any kind; provided, that this section does not apply to legal notices and

18   advertisements placed on the bulletin boards which are now owned or may be supplied for

19   this purpose."[15]

20   **a.    Facial Challenge to FCCO § 13.24.010(B)(4)**

21   Plaintiffs argue with very little detail that this ordinance is unconstitutional on its face.

22   <u>See, e.g.</u>, dkts. 13 ("unlawful on its face and as applied"); 75 ("unlawful on its face because

23   there is no compelling or substantial interest in preventing the distribution of handbills.").

24   To the extent this argument is premised on the discretion granted to the administrative officer

25   to grant or deny permits to parties hoping to distribute handbills or circulars, the Court has

26   already concluded that such discretion is not excessive.  However, to the extent that it is

27   premised on the lack of a government interest in banning handbills, the Court agrees with the

28

[15] Emphasis added.

United States District Court
For the Northern District of California

1    Plaintiffs; the Court also concludes that the section <u>does not</u> leave open ample alternative

2    channels of communication.  <u>See</u> <u>Perry</u>, 460 U.S. at 45; <u>Ward</u>, 491 U.S. at 791.

3         In <u>Talley v. California</u>, 362 U.S. 60, 62 (1960), the Supreme Court recalled having

4    held in <u>Lovell v. City of Griffin</u>, 303 U.S. 444 (1938) that an ordinance was "void on its face

5    . . . that comprehensively forbade any distribution of literature at any time or place in Griffin,

6    Georgia, without a license," and reiterated that "[p]amphlets and leaflets . . . have been

7    historic weapons in the defense of liberty."  Indeed, the Ninth Circuit recently noted that "the

8    Court has struck down content-neutral, time, place, and manner restrictions that are so broad

9    as to burden substantially one's freedom of speech," specifically citing <u>Schneider v. New</u>

10   <u>Jersey</u>, 308 U.S. 147, 162-63 (1939), which involved striking down an ordinance prohibiting

11   the distribution of handbills.  <u>Nordyke v. King</u>, 644 F.3d 776, 790 (9th Cir. 2011).  <u>See</u>

12   <u>also</u> <u>Rosen v. Port of Portland</u>, 641 F.2d 1243, 1247 (9th Cir. 1981) ("We find the

13   requirement of advance registration as a condition to peaceful pamphleteering, picketing, or

14   communicating with the public to be unconstitutional.").

15        It is hard to imagine a government interest so significant that it justifies the sweeping

16   ban Defendants have enacted here.  <u>See</u> <u>Heffron</u>, 452 U.S. at 690 (O'Connor, J., concurring)

17   ("we have expressly noted that leafletting does not entail the same kinds of problems

18   presented by face-to-face solicitation. . . . With the possible exception of avoiding litter, <u>see</u>

19   <u>Schneider v. State (Town of Irvington)</u>, 308 U.S. 147, 162 . . . (1939), it is difficult to point

20   to any problems intrinsic to the act of leafletting that would make it naturally incompatible

21   with a large, multipurpose forum such as those at issue here."  Importantly, the Defendants

22   here <u>did not even attempt</u> to assert in their briefing an interest in banning handbilling.

23   <u>See</u> dkt. 42 at 36-37 (discussion of handbill section).  Nor did Defendants proffer a defense

24   of the section at the motion hearing.  In the absence of any articulated interest – substantial or

25   otherwise – and because the Court can imagine none, the Court concludes that the section is

26   not narrowly tailored as it promotes no "substantial governmental interest that would be

27   achieved less effectively absent the regulation," and there has been no demonstration by

28

United States District Court
For the Northern District of California

Defendants that "the means chosen are not substantially broader than necessary to achieve [any such] interest."  See Ward, 491 U.S. at 783.

Defendants argue, however, that "[t]he regulation pertaining to handbill/circular distributions was never the subject of implementing regulations promulgated by the CAO" and is therefore a "red herring."  See dkt. 42 at 31, 36.  They provide no authority for this assertion, nor do they cite to any authority stating that an ordinance not subject to implementing regulations is exempt from constitutional scrutiny.  Indeed, it makes no sense to the Court that the absence of an implementing regulation works to exempt an ordinance from compliance with the Constitution.  The Court finds that, so long as the ordinance is on the books, it threatens to chill speech.

Even if Defendants were correct, however, Plaintiffs allege that the statute has been applied to them, and so the section is properly the subject of an as-applied challenge.

**b.      As-Applied Challenge to FCCO § 13.24.010(B)(4)**

Plaintiffs contend that the ordinance has been unconstitutionally applied in that "persons demonstrating in the Courthouse Park have been told that it [is] unlawful to hold a sign, waive [sic] a sign, sing or chant, because these actions are unlawful meetings under the ordinances" and that "[a]t least one person has been arrested on the ground that he was holding a sign in Courthouse Park."  See dkt. 13 at 16.  They further allege that "The no signs and handbills rule was applied to Mr. Dominguez [sic] and others."  See dkt. 75 at 10 (not specifying who the "others" are).  Plaintiff Michael Dominquez states in a declaration that he was told by an officer that he was not allowed to have a sign, see dkt. 13-8 ¶ 8, told by the officer that he needed a permit to hold a sign, id. ¶ 9, and then arrested by the officer for not having a permit to hold a sign, id. ¶¶ 14-15.[16]

---

[16] Plaintiffs further represented at the motion hearing that they were sent a letter by Defendants telling them that they are not allowed to leaflet; they stated that the letter was attached to the amended Complaint.  The Court reviewed the amended Complaint, dkt. 31, and did not find such a letter attached.

United States District Court
For the Northern District of California

Defendants respond that this section "was never articulated as a ground for arrest of any OF participant," and "has never been the subject of . . . any enforcement activity taken against OF." Dkt. 42 at 36-37. They assert that "the Dominguez [sic] and Engel arrests that occurred outside the 12:00 midnight to 6:00 a.m. time frame" were premised on "the permit process and [] a Penal Code prohibition of lewd conduct, not the 'ban' on distribution of handbills/circulars." Id. at 37 (citing Andreotti Decl.[17] and Pursell Decl.[18]). The Andreotti and Pursell declarations do not address Dominquez, however, and so do not contradict his account, which is that he experienced an arrest and enforcement activity based on the section. Compare dkts. 43, 52 with dkt. 13-8.

Defendants' other efforts to undermine Dominquez's declaration are also unavailing. Their argument that Dominquez has "unclean hands" because he admits that he spent the night in Courthouse Park "plenty of times" is absurd; Dominquez did not sacrifice his First Amendment rights because he stayed the night at the Park without permission. See dkt. 42 at 45-46. Defendants' argument that Dominquez's claim is an outlier has more merit but also fails. Dominquez is (and the other Occupy Fresno protestors are) far more likely to be subjected to offending conduct than the plaintiff in City of Los Angeles v. Lyons, 461 U.S. 95 (1983). In Lyons, 461 U.S. at 102-104, the Supreme Court held that, where the plaintiff had been subjected to a dangerous chokehold following a traffic violation, he was not entitled to injunctive relief because it was speculative whether he would be subjected to such a chokehold in the future. Here, Occupy Fresno protestors will continue to protest at Courthouse Park and continue to interact with Fresno police on a regular basis. See Reply at 13 ("there have been about 90 arrests and the threat of more is still present"). They are therefore likely to be confronted with § 13.24.010(B)(4) and the handbill ban again, unless an injunction issues.

---

[17] This declaration asserts only that "all arrests but two have occurred between the hours of 12:00 midnight and 6:00 a.m." See dkt. 43 at 3: 9-11. It does not discuss Dominquez.

[18] This declaration describes his arrest of Engel, for disorderly conduct and a lewd act, based on public urination. See dkt. 52. It also does not discuss Dominquez.

**United States District Court**
For the Northern District of California

The handbill ban is therefore unconstitutional.

### 5.   Conclusion as to Likelihood of Success

Accordingly, the Court concludes that Plaintiffs <u>have</u> demonstrated a likelihood of success on their arguments that (1) FCCO § 13.20.020's definition of a pubic meeting as "the assemblage of ten or more persons by prearrangement, common design or as a result of advertising, solicitation or other promotion," and (2) FCCO § 13.24.010(B)(4)'s ban on distributing "any handbills," are both unconstitutional as not narrowly tailored.  The Court finds Plaintiffs <u>not</u> likely to succeed on their argument that it is their constitutional right to remain in Courthouse Park after midnight.

### C.   Irreparable Harm

A plaintiff seeking a preliminary injunction must also demonstrate a likelihood of "irreparable harm in the absence of preliminary relief."  <u>See</u> <u>Winter</u>, 555 U.S. at 20.  The resolution of this factor turns, in this case, on the resolution of the preceding factor.  Because Plaintiffs have succeeded in demonstrating a likelihood of success on the merits (i.e., that their First Amendment rights are being violated), they have also succeeded in demonstrating a likelihood of irreparable harm.  <u>See</u> <u>Elrod</u>, 427 U.S. at 373 ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.").

### D.   Balance of Hardship and Public Interest

The final two <u>Winter</u> factors that a plaintiff must demonstrate are that the "balance of equities tips in his favor, and that an injunction is in the public interest."  <u>See</u> <u>Winter</u>, 555 U.S. at 20.  Plaintiffs have demonstrated both.

First, the Ninth Circuit has observed that "[c]ourts considering requests for preliminary injunctions have consistently recognized the significant public interest in upholding First Amendment principles."  <u>See</u> <u>Sammartano v. First Judicial Ct.</u>, 303 F.3d 959, 974 (9th Cir. 2002) (collecting cases).  A court's public interest inquiry is to focus primarily on the impact on non-parties.  <u>Id.</u>  The ongoing enforcement of the two sections the Court has deemed unconstitutional would infringe not only on the Occupy Fresno movement, but on

United States District Court
For the Northern District of California

any other member of the public who wishes to (1) gather with nine or more people in Courthouse Park or (2) distribute leaflets or hold signs there without first applying for a permit.  The chilling effect that both sections could have on speech is considerable. Although Defendants have articulated, and the Court has recognized in this Order, several governmental interests at stake in this litigation, see dkt. 42 at 49 ("1) maintaining Courthouse Park in aesthetically pleasing and sanitary conditions for the benefit of all park users; 2) prevention of park overuse; and 3) promotion of the public health, safety and welfare"), none outweigh Plaintiffs' interest in the free exercise of their First Amendment rights.

Second, the Court notes that Defendants' arguments about hardship are primarily addressed to Plaintiffs' request to occupy the Park on a 24-hour basis.  See dkt. 42 at 49-52. The Court is not granting that request.  Although there could potentially be some increased strain on the Park's aesthetics and sanitation if the Court enjoined the enforcement of the two unconstitutional sections, as well as some inconvenience to Defendants in having to rewrite them,[19] the Court finds that the hardship faced by Defendants is minimal.  In contrast, again, Plaintiffs have demonstrated likely irreparable injury if an injunction does not issue.

Accordingly, the public interest factor and balance of the hardships factor both favor Plaintiffs.  Plaintiffs have therefore demonstrated all of the factors required by Winter, 555 U.S. at 20.

## VI.   CONCLUSION

For the foregoing reasons, the Court GRANTS the Motion in part, finding sections FCCO § 13.20.020 (the definition of a pubic meeting as "the assemblage of ten or more persons") and FCCO § 13.24.010(B)(4) (the ban on distributing "any handbills") unconstitutional.[20]  Plaintiffs are instructed to submit a proposed form of injunction by 5:00

---

[19] Defendants have not demonstrated that their interests in health, safety or welfare would be negatively impacted by the presence of more than 10 people or by those people holding signs.

[20] The Court declines Plaintiffs' request that it enter declaratory judgment at this time.

1  p.m. today; Defendants shall submit their comments to the proposed form of injunction by

2  noon tomorrow.

3      **IT IS SO ORDERED.**

4

5  Dated: December 13, 2011                        _____

6                                                  CHARLES  R. BREYER
                                                    UNITED STATES DISTRICT JUDGE
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28